# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| APRIL GRAY, | CASE NO. 3:13-cv-01944-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 10, 11, 12, 13, 14 |

## I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff April Gray for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff has been diagnosed with depression, generalized anxiety disorder, bipolar disorder, borderline personality disorder, and post-traumatic stress disorder. Objective evidence demonstrated impairments in social functioning and concentration, persistence, and pace. Every medical source opinion in the record indicated moderate limitations overall in concentration, persistence, and pace, and several specific categories, such as following instructions, maintaining attention for extended periods of time, and working without being distracted. The ALJ made specific findings that Plaintiff had difficulty, *inter alia*, finishing tasks and concentrating. However, the ALJ did not include any nonexertional limitations in evaluating Plaintiff's residual functional capacity ("RFC") beyond restricting social interaction and limiting her to unskilled work. The ALJ did not include any additional limitations in following instructions, simple or routine work, concentration,

persistence, or pace. The ALJ found that unskilled work sufficiently accounted for Plaintiff's other limitations. The only rationale offered by the ALJ were two treatment notes, prior to the alleged onset date, that Plaintiff had intact memory.

Plaintiff asserts that a limitation to unskilled work is not sufficiently specific to account for her difficulties in concentration, persistence and pace. Third Circuit precedent requires an ALJ to include restrictions specific to nonexertional limitations, including concentration, persistence, and pace, unless the record otherwise suggests that no additional limitations are necessary. Burns v. Barnhart, 312 F.3d 113 (3d Cir. 2002); Ramirez v. Barnhart, 372 F.3d 546, (3d Cir. 2004). Here, the record does not otherwise suggest that no additional limitations are necessary, where the ALJ pointed only to two treatment notes prior to the alleged onset date despite objective and opinion evidence during the relevant period documenting Plaintiff's limitations. Ramirez squarely addressed this issue, and found that an ALJ"s limitation to simple tasks was insufficient to account for moderate limitations in concentration, persistence, and pace. Ramirez remanded the case to the ALJ for further findings. Defendant has offered no legitimate reason to find that Ramirez does not apply in this case.  For the foregoing reasons, the Court concludes that the ALJ's decision lacks substantial evidence, grants Plaintiff's appeal, vacates the decision of the Commissioner, and remands for further proceedings.

## II.     Procedural Background

On July 14, 2010, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 204-225). On December 21, 2010, the Bureau of Disability Determination denied these applications (Tr. 126-135), and Plaintiff filed a request for a hearing on January 4, 2011.  (Tr. 136-37). On July 28, 2011, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr.

23-87). On September 21, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-22). On November 25, 2011, Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals Council denied on May 17, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On July 17, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 19, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On January 13, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 12). On February 14, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 13). On February 24, 2014, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 14). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on June 9, 2014, and an order referring the case to the undersigned for adjudication was entered on June 10, 2014. (Doc. 16, 17, 18).

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the

Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

### IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520,

416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on April 1, 1981 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 29). She has a limited (tenth grade) education and past relevant work as a shipping/receiving clerk, car salesperson, and day worker. (Tr. 40).  Plaintiff ran away from a dysfunctional family in 1997, when she was fifteen, and was unable to complete her education. (Tr. 587, 595). She was raped when she was sixteen by a friend's cousin, who went to jail. (Tr. 587. 595). In 2000, she entered into a relationship with her now ex-boyfriend and had her first child. (Tr. 371, 587, 595). She had two more children with him, but he was severely physically abusive to her, kicking and hitting her in the head. (Tr. 587, 595). By June of 2008, Plaintiff had left him and was living on her own, but was incarcerated shortly thereafter for theft by deception. (Tr. 397). Her mental health diagnoses include major depressive disorder, generalized anxiety disorder ("GAD"), bipolar disorder, borderline personality disorder, and post-traumatic stress disorder ("PTSD"). She also has scoliosis, a large disc herniation with significant stenosis that touches her nerve roots, "minimal" degenerative changes, and obesity. (Tr. 410, 550).

**Mental Impairments**

On March 12, 2007, Plaintiff saw Jannis VanArsdale, CRNP, at Yorktown Family Medicine for worsening depression and anxiety. (Tr. 387). She had been off her anti-depressant medication and birth control since the beginning of the year because she could not afford them, and was ten weeks pregnant. (Tr. 387). Ms. VanArsdale spent forty-five minutes counseling her on the stresses of her life and "just allowed her to cry and talk." (Tr. 387). On February 21, 2008, Plaintiff saw Ms. Van Arsdale. (Tr. 420). She had many stressors, was tired all the time, and had no energy to do anything. (Tr. 420). Ms. Van Arsdale prescribed Zoloft. (Tr. 420).

On March 10, 2008, Plaintiff had an initial assessment at Wellspan Behavioral Health. (Tr. 393). She was depressed, anxious, and reported poor relationships, but her appearance, memory and concentration, and energy were within normal limits. (Tr. 393). Her insight and judgment were fair. (Tr. 393). She was diagnosed with major depression, recurrent, and assessed a GAF of 55. (Tr. 394). On March 19, 2008, Plaintiff followed-up at Wellspan. (Tr. 400). She discussed her poor finances and credit and her desire to eventually live on her own and get away from the abusive father of her children. (Tr. 400). She had mild impairments in depression, sadness, energy, motivation, social and family problems, anxiety, activities of daily living, and job performance. (Tr. 400).

On April 23, 2008, Plaintiff reported that she had been fired that morning. (Tr. 399). She had been in jail the night before because of theft by deception. (Id.). She explained that she had been going through hard times financially and "wasn't thinking." (Id.). She was extremely upset, tearful, appeared remorseful, embarrassed, and ashamed. (Id.). She had severe impairments in depression, anxiety, and job performance. (Id.). She had moderate impairments in social and family problems. (Id.). She had mild impairments in thinking, memory, or concentration,

impulsiveness, aggressiveness, recklessness, or self-injurious behavior, appetite, energy, motivation, and activities of daily living. (Id.).

On May 8, 2008, Plaintiff followed-up at Wellspan. (Tr. 398). She reported "terrible guilt" for her legal problems. (Id.). She had severe impairments in job performance, moderate impairments in depression, sadness, anxiety, activities of daily living, sleep, social and family problems, energy, and motivation. (Id.). She had mild impairments in thinking, memory, or concentration, impulsiveness, aggressiveness, recklessness, or self-injurious behavior. (Id.).

On June 5, 2008, Plaintiff followed-up at Wellspan Behavioral Health. (Tr. 397). She discussed the many stresses in her life, including having her car repossessed, her upcoming court date, and leaving the abusive father of her children. (Tr. 397). She had moderate impairments in depression, sadness, anxiety, social and family problems, and job performance. (Tr. 397). She had mild impairments in energy, motivation, thinking, memory, concentration, activities of daily living, sleep, and appetite. (Tr. 397). She had made no progress in her treatment goals. (Id.).

On June 17, 2008, Plaintiff followed-up at Wellspan. (Tr. 396). She had been to Court and offered three months in jail, but she was trying to get a better plea. (Id.).  She was fearful of going to jail, losing her job, and being away from her children. (Id.). She had moderate impairments in depression, sadness, anxiety, and social and family problems. (Id.). She had mild impairments in energy, motivation, thinking, memory, concentration, activities of daily living, sleep, and appetite. (Tr. 396). She had made no progress in her treatment goals. (Id.).

On July 17, 2008, Plaintiff followed-up at Wellspan. She discussed her independence, finances and her relationship with her children's father. (Tr. 395). She had moderate impairments in depression, sadness, anxiety, and social and family problems. (Id.). She had mild impairments in energy and motivation, thinking, memory, concentration, activities of daily living, job

performance, sleep, and appetite. (Id.). She had made no progress in her treatment goals. (Id.).

On July 13, 2008, Plaintiff was evaluated at Wellspan by Dr. Ramana G. Surya, D.O. (Tr. 369). Plaintiff was still taking Zoloft. (Tr. 369). She complained of depression symptoms, including trouble concentrating. (Tr. 369). Her boyfriend was in jail with a protective order against him. (Tr. 369). She had no thought disorder, grossly intact cognition, and fair insight and judgment. (Tr. 369). She was assessed a GAF of 50. (Tr. 370). Plaintiff followed-up on July 23, 2008. (Tr. 371). She had many stresses-she had broke up with the father of her children, moved, was sleeping on an air mattress, her baby was sick and teething, and her legal problems continued. (Tr. 368).  She was given a trial of Lamictal. (Tr. 371).

On January 4, 2009, Plaintiff followed up at Wellspan. (Tr. 368). She had been incarcerated for her retail theft charge and was never able to fill her prescription for Lamictal, so she was given a new trial. (Tr. 368). She was still on house arrest. (Tr. 368). She had been struggling to get a job because of her felony, but was working on the weekends. (Tr. 368).

On April 22, 2009, Plaintiff followed up at Wellspan (Tr. 367). She could no longer afford her prescriptions because she lost her job. (Id.). She was on probation for five years. (Id.). She reported that she still gets depressed, had mood swings, and her sleep was off and on. (Id.). She was prescribed Cymbalta. (Id.).  On April 28, 2009, Plaintiff was assessed a GAF of 50. (Id.). Her diagnoses were updated to include PTSD and GAD. (Tr. 435).

On June 17, 2009, Plaintiff followed up at Wellspan. (Tr. 392). She discussed her relationship with her ex-boyfriend, current boyfriend, children, work, and finances. (Id.). She had mild impairments of depression, medical conditions, social and family problems, job and school performance, and sleep disturbance, and moderate impairments of anxiety, but no impairment in thinking, memory, and concentration.  (Id.). On July 17, 2009, Plaintiff followed-up at Wellspan.

(Tr. 366). She reported that her moods swings were horrible. (Id.). She was desperate for money, her rent was due, her car needed inspection, and she had no stove, refrigerator, or washer and dryer. (Id.). She had got in trouble with the law again two days earlier while on probation. (Id.).

On September 18, 2009, a state agency consultant, Dr. Peter Garito, Ph.D, completed a mental RFC assessment. (Tr. 492). He opined that Plaintiff had moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. (Tr. 492). He opined that she can make "simple decisions," carry out "very short and simple instructions" and do "simple, routine tasks in work-like settings." (Tr. 493). On the Psychiatric Review Technique Form ("PRTF"), he opined that she had mild restriction in activities of daily living, moderate difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 505).

On August 30, 2009, Plaintiff was incarcerated for new charges. She reported depression, mood swings, irritability, anxiety, and was prescribed Elavil. (Tr. 579). By October 12, 2009, she was "not doing well" on Elavil. (Tr. 560). She reported that she was "very short fused, on edge about everything" and that she had been sleeping a lot. (Tr. 560). Her Elavil was increased the next day. (Tr. 579). She was rechecked on October 20, 2009, and was observed to have "personality issues" but her mood swings were somewhat better. (Tr. 579). She again reported on November 26, 2009 that Elavil was not working for her because she was still depressed, anxious, experiencing mood swings, stays in bed, and does not get up to eat. (Tr. 560). She continued taking Elavil through December of 2009, but changed to an evening dosage because she was not waking up in the morning to take it then. (Tr. 560). On December 1, 2009, Plaintiff had been

noncompliant with Elavil because it was "not doing anything." (Tr. 578). She complained of depression, anxiety, and was observed to have "prominent personality issues." (Tr. 578). The physician discontinued Elavil and prescribed Celexa. (Tr. 578). On January 26, 2010, she was compliant with Celexa and reported that everything was fine, but by April 6, 2010, Plaintiff was noncompliant with Celexa and requested that it be stopped because she was in gym and did not like the "med line." (Tr. 578). Plaintiff was released shortly thereafter.

On September 13, 2010, Plaintiff had a psychiatric evaluation with Dr. Leslie Lee, M.D. (Tr. 587-88). She explained that she ran away from home when she was fifteen because her mother and father were using marijuana and severely dysfunctional. (Tr. 587). She discussed her abusive relationship with the father of her children. (Tr. 587). She explained that she was never able to fully comply with psychotropic medication and treatment because she did not have insurance and was in and out of jail. (Tr. 587). She was initially withdrawn, but engaged fully later on. (Tr. 587). Her affect was depressed and mood congruent with normal thought process and no signs of psychosis. (Tr. 587). She had reserved insight and judgment. (Tr. 588). She had "full symptoms of depression" so she was prescribed Zoloft and trazodone and was assessed a GAF of 45 to 50. (Tr. 588). On November 1, 2010, Plaintiff followed-up with Dr. Lee. She had no complaints, but was still anxious and depressed. (Tr. 643). Dr. Lee increased her Zoloft and instructed her to continue attending therapy. (Tr. 643).[1]

On December 7, 2010, Plaintiff was evaluated by Dr. Anthony Fischetto, Ed.D, a state agency consultant. (Tr. 594). She reported that she was getting counseling at Pennsylvania Counseling. (Tr. 595). She reported that she had a hard time concentrating in school and dropped

---

[1] Despite multiple requests by Plaintiff's counsel and a subpoena by the ALJ, records from Plaintiff's counseling were never provided. Given that the Court is remanding, the ALJ may exercise her discretion if necessary to take further steps to obtain these records.

out. (Tr. 595). She discussed the abusive father of her children and her rape. (Tr. 595). The father has been in jail for domestic violence three times. (Tr. 595). She indicated that she raises her three children with her mother and father. (Tr. 595). Children's Services was involved when the children were at the father's house and the three-year old got out of the house. (Tr. 595).

Dr. Fischetto's objective findings included slow psychomotor activity, slow and low-volume speech, flat affect, slow productivity of thought, slow on naming the name of the United States' president, and slow information and intelligence for the general fund of knowledge. Her concentration was "poor for serial sevens." (Tr. 597). Her memory was "slow for remote memory, recent past memory, and recent memory. Immediate retention and recall was slow for Digit Span. She had difficulty spelling 'world' backwards." (Tr. 598). Her social judgment and test judgment were poor. (Tr. 598). Her thoughts were goal-directed and her abstract thinking was "good for similarities." (Tr. 597). Dr. Fischetto diagnosed her with depression, panic disorder without agoraphobia, and borderline personality disorder "with a lot of anger." (Tr. 598). He assessed her a GAF of 50. (Tr. 598).

Dr. Fischetto opined that Plaintiff's concentration, persistence and pace were "poor" because she "has trouble focusing, paying attention, she gets side-tracked. She appears to have a limited attention span today during the evaluation." (Tr. 599). He opined that she had slight limitations in the ability to understand, remember, and carry out simple instructions and slight to moderate limitations in the ability to understand, remember and carry out detailed instructions and make judgments on simple work related decisions. (Tr. 600). He opined that she had slight limitations in her ability to respond appropriately to work pressures in a usual work setting or to respond appropriately to changes in a routine work setting. (Tr. 600).

On December 16, 2010, Dr. Sandra Banks, Ph.D, completed a mental RFC assessment.

She opined that Plaintiff has a moderate limitations in her ability to maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 602-03). She opined that Plaintiff could only perform "simple, routine work in a stable environment." (Tr. 604). She found that Dr. Fischetto's opinion was "fairly consistent with the other evidence in file." (Tr. 604). On the PRTF form, she opined that Plaintiff had mild restriction in daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 615).

On January 3, 2011, Plaintiff followed-up with Dr. Lee. She was still in financial stress, but seemed to be sleeping and eating "okay" and had no other complaints. (Tr. 642). Dr. Lee continued her medication and assessed her a GAF of 60. (Tr. 642). On April 18, 2011, Plaintiff was evaluated by Dr. Lee. (Tr. 641). She still had many stresses, but she was alert and oriented with coherent, normal and goal directed speech. (Tr. 641). She was cooperative and not in distress. (Tr. 641). She continued Plaintiff's Zoloft and increased her trazodone. (Tr. 641). Dr. Lee assessed her with a GAF of 55 to 60. (Tr. 641).

**Physical Impairments**

Plaintiff saw Ms. VanArsdale on February 21, 2008, April 8, 2008, May 27, 2008 and July 24, 2008, and did not mention back pain. (Tr. 379-83). On March 17, 2009, Plaintiff reported back pain, muscle spasm, and painful flexion to Ms. VanArsdale, but her straight leg raise was negative and there was no indication of sensory or reflex loss. (Tr. 377). She was

assessed "probable scoliosis." (Tr. 377). May 12, 2009, Plaintiff saw Ms. VanArsdale and denied having any musculoskeletal problems. (Tr. 375). On May 28, 2009, Plaintiff had back pain, muscle spasm, and painful flexion, but deep tendon reflexes and strength were normal. (Tr. 374).

On June 22, 2009, Plaintiff was evaluated by Dr. K. Nicholas Pandelidis, M.D. for her back pain. (Tr. 410). She had a mass that was not tender and evidence lumbar scoliosis with forward bend. (Tr. 410). However, she had upright stance, "good" gait, no muscle spasm, no tenderness, no leg weakness, and symmetric reflexes. (Tr. 410). She tolerated hip rotation and straight leg raise well. (Tr. 410).

Plaintiff had a physical exam at York County Prison on September 11, 2009 after being incarcerated two weeks earlier. (Tr. 584). She had decreased range of motion, pain, and muscle spasm. (Tr. 584). She was "unable to stand straight, able to bear [weight] on both legs but reports pain and numbness of left leg, able to dorsiflex and plantar flex left foot, no foot drop, gait slow and guarded." (Tr. 584). On September 16, 2009, Plaintiff was restricted from gym and was to perform "no work" until cleared by medical staff as a result of chronic low back pain. (Tr. 577). She indicated that muscle rubs and naproxen were not working, and was prescribed flexeril, but only for three days. (Tr. 577). She was able to walk and transition easily up to the exam table, but her range of motion was slightly restricted and she had a small muscle spasm. (Tr. 577). On September 21, 2009, she reported that her left leg was numb and she was brought to the medical unit via wheelchair. (Tr. 576). She walked with a limp secondary to pain and was diagnosed with degenerative disc disease and scolioisis. (Tr. 576). She was prescribed another seven days of flexeril. (Tr. 576). On October 8, 2009, Plaintiff was complaining of unresolved back pain. (Tr. 576). When she was told to exercise, she became belligerent and was asked to leave the examination room before an exam was done. (Tr. 576). On April 7, 2010, Plaintiff reported that

she was "doing well," was exercising to lose weight, and her back pain had improved. (Tr. 575). She was released from prison shortly thereafter.

On June 17, 2010, Plaintiff reported pain to Ms. VanArsdale but denied other musculoskeletal problems (Tr. 524). She had normal grip, strength, range of motion in her back, and deep tendon reflexes. (Tr. 525). She had negative straight leg raises and could heel and toe walk. (Tr. 525). On July 6, 2010, Plaintiff saw Dr. Nicholas S. Bower, D.O., at Yorktown Family Medicine, and reported she had some relief of symptoms with flexeril (Tr. 521). She had pain and muscle spasm, but no neurological symptoms and normal coordination. (Tr. 523).

On July 14, 2010, Plaintiff was evaluated by Dr. Brenda R. Tomanek. (Tr. 511). Plaintiff reported pain, numbness, and tingling, but her reflexes were normal. (Tr. 510). On July 15, 2010, Plaintiff saw Dr. Nivedita Boinapally, MD., at Yorktown Family Medicine. She had no tenderness to palpation, but her range of motion was severely limited secondary to pain. (Tr. 520). Although Plaintiff self-reported numbness and tingling, Dr. Boinapally did not perform any objective tests to measure sensory or reflex loss. (Tr. 520). On July 29, 2010, Plaintiff saw Dr. Nicholas S. Bower, D.O, at Yorktown Family Medicine, and reported that her tramadol and flexeril "take the pain down to minimal or moderate level." (Tr. 515). She was going to the gym. (Tr. 515). She had spasm but no neurological symptoms with normal coordination. (Tr. 517).

On July 23, 2010, an MRI of Plaintiff's lumbar spine indicated a large disc herniation that compromises the left lateral recess and touches the left side of the L5 nerve with 10.6 mm posterior protrusion, along with minimal degenerative changes of the L5-S1 disc. (Tr. 555).

On August 4, 2010, Plaintiff saw Ms. VanArsdale, CRNP. Plaintiff had pain and a positive straight leg raise, but normal motor, sensory, and reflex testing, muscle tone, gait, and balance. (Tr. 544-48). Her lower extremity pulses were intact, she had no muscle atrophy and she

denied symptoms of neuropathy and claudication. (Id.).

### Function Report, Testimony, and ALJ Findings

On August 15, 2010, Plaintiff's mother completed a Function Report. (Tr. 311). On August 16, 2010, Plaintiff completed a Function Report. Both indicated that her back pain impacts her ability to care for her children, meal preparation, house and yard work. (Tr. 311-313, 328-330). Plaintiff additionally reported that her back pain impacts her personal care and sleep. (Tr. 328-30). She reported that she had difficulties getting along with others and had been fired from jobs as a result. (Tr. 333). She reported that her ability to pay attention "depends," and that she can pay attention for "maybe an hour or two." (Tr. 333). She reported that she could not finish tasks that she started, and if she did finish them, it was always at a later time. (Tr. 333). Plaintiff indicated that she does not follow spoken instructions because she forgets what was said. (Tr. 333). Plaintiff indicated that she follows written instructions "okay" but she always has to re-read them. (Tr. 333). However, Plaintiff's mother reported that she follows written and spoken instructions "very well." (Tr. 316). Plaintiff and her mother indicated that her pain limited her from completing tasks. (Tr.316, 333). Plaintiff reported that she does not handle changes in routine unless they are "her changes." (Tr. 334). Plaintiff indicated that she has abnormal fears that people will hurt her mentally "because everyone lies." (Tr. 334).

Plaintiff appeared and testified at a hearing before the ALJ on July 28, 2011. (Tr. 36). She testified that she was currently incarcerated for stealing tools. (Tr. 45). She testified that she was able to read, but had problems concentrating while reading. (Tr. 40). She testified that when she first arrived at prison, she was put on suicide watch for about five days. (Tr. 41). She testified that her depression keeps her from getting out of bed and doing household chores. (Tr. 45). She explained that her depression and anxiety had worsened since being in prison and that she felt

like a failure. (Tr. 45). She testified that her older children "pretty much fend for themselves" and help out with her younger son. (Tr. 63). She testified that she has problems with personal hygiene and has gone four days without taking a shower. (Tr. 65). She testified that she has mood swings, anger problems, and problems with impulsivity. (Tr. 66). She testified that she has panic attacks and that her post-traumatic stress disorder causes nightmares and flashbacks. (Tr. 69). She testified that she would have to call off work two to three days a week because of a combination of her back, bowels, and depression. (Tr. 72).

She testified that she had been self-employed in 2010 cleaning homes but that her back pain forced her to take breaks, so she charged her clients based on what they wanted her to do, rather than how long it took her to complete the job. (Tr. 38). She testified that her doctor had restricted her from lifting more than five pounds and that she had problems sitting or standing for more than fifteen minutes. (Tr. 46). She testified that a sit/stand option would not enable her to work because she also needed to be able to stretch and walk away from her station. (Tr. 47).

A VE also appeared and testified. (Tr. 83). The VE testified that, given the ALJ's RFC assessment described below, Plaintiff could not perform her past relevant work, but could perform other work in the national economy, such as a final assembler, a label picker, and a table worker. (Tr. 78-82). Plaintiff's counsel was allowed to question the VE, but the ALJ required her to include all of her limitations in one hypothetical because she was under contract to let the VE leave at 5:00. (Tr. 84). The vocational expert testified that a GAF score of 50 or below would preclude an individual from working. (Tr. 84). The VE testified that if a claimant would either call off work two or three times per week or be off task twenty to thirty percent of the day, there would be no work in the national economy that could be performed. (Tr. 85).

The ALJ issued her decision on September 21, 2011. At step one, the ALJ found that Plaintiff was insured through December 31, 2013 and had not engaged in substantial gainful activity since September 1, 2008, the alleged onset date. (Tr. 13). At step two, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine, scoliosis, sciatica, obesity, generalized anxiety disorder, major depressive disorder, bipolar disorder, post-traumatic stress disorder, personality disorder, and irritable bowel syndrome were severe. (Tr. 13).  The ALJ found that Plaintiff's neck pain and hand numbness were not caused by medically determinable impairments and that Plaintiff's gallstones were non-severe. (Tr. 13).  At step three, the ALJ found that Plaintiff did not meet or equal a listing. (Tr. 14-16). The ALJ found that Plaintiff had the RFC to do a limited range of sedentary work with a sit/stand option, limited to occasionally climbing ramps, stairs, stooping, and interacting with supervisors, never interacting with coworkers or the public, and unskilled work. (Tr. 16). She is also limited to positions where she is within two minutes of a rest room with up to two additional five minute restroom breaks. (Tr. 16). At step four, the ALJ found that Plaintiff could not perform any past relevant work, but at step five, the ALJ found that Plaintiff could perform other work in the national economy, such as a final assembler, a label picker, and a table worker. (Tr. 21).

## VI.     Plaintiff Allegations of Error
### A.     The ALJ's RFC assessment and VE hypothetical

Here, the ALJ found that, despite Plaintiff's multiple severe impairments, the only nonexertional limitations she needed were a restriction to unskilled work and limiting her social interactions. The ALJ did not include any limitations in concentration, understanding, following instructions, adapting to changes in the workplace, or following instructions.  Plaintiff asserts that the ALJ's failure to include specific limitations in the RFC assessment regarding her concentration, persistence, and pace violate Third Circuit precedent. In Burns v. Barnhart, 312

F.3d 113 (3d Cir. 2002), the ALJ had found that the claimant had borderline intellectual functioning, and accommodated for this limitation by restricting the claimant to simple, repetitive, one and two-step tasks. The Third Circuit found that the ALJ's step five determination, based on a VE hypothetical, lacked substantial evidence:

> Here, the ALJ's hypothetical did not refer to any of the type of limitations later outlined in Dr. Laviolette's report. Instead, it merely referred to "simple repetitive one, two-step tasks." This phrase, however, does not specifically convey Burns' intellectual limitations referenced in Dr. Laviolette's report. Rather, it could refer to a host of physical and mental limitations, such as a person's mechanical or small motor skills, his lack of initiative or creativity, or a fear of, or unwillingness to take on, unfamiliar tasks. While the phrase could encompass a lack of intelligence, it does not necessarily incorporate all of the borderline aspects of Burns' intellectual functioning or the other deficiencies identified in Dr. Laviolette's report. For example, it certainly does not incorporate Dr. Laviolette's finding that Burns is borderline in the areas of reliability, common sense, ability to function independently, and judgment, or that he manifests flightiness, disassociation, oppositional tendencies, and difficulties in comprehension. As a result, the hypothetical did not include all of the limitations suffered by Burns, thus making it deficient.

Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002). More importantly, the Third Circuit has specifically addressed the need to include limitations in concentration, persistence, and pace in an RFC assessment or VE hypothetical. In Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004), the Court held that a limitation to simple one or two step tasks was not sufficient to convey limitations in concentration, persistence, and pace identified on a Psychiatric Review Technique Form ("PRTF"):

> These limitations do not adequately convey all of Ramirez's limitations. The Commissioner contends that the limitation to one to two step tasks is sufficient, but we agree with the Magistrate Judge that a "a requirement that a job be limited to one to two step tasks, as was stated in the hypothetical relied upon by the ALJ, does not adequately encompass a finding that [Ramirez] 'often' has 'deficiencies in concentration, persistence, or pace,' as was noted by the ALJ both in her decision and on the PRTF attached to the decision." (Appendix at 72.) Most importantly, this limitation does not take into account deficiencies in pace. Many employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time. If Ramirez often suffers deficiencies in pace and this had been included in the hypothetical,

vocational expert Stratton may have changed her answer as to whether there were jobs in the local or national economy that Ramirez could perform. In fact, the vocational expert testified that each of the jobs suitable for Ramirez (assembler, packer, and inspector) would have daily production quotas and that Ramirez would have to maintain a certain degree of pace to maintain those jobs.

This omission from the hypothetical runs afoul of our directive in *Chrupcala* that a "hypothetical question posed to a vocational expert 'must reflect *all* of a claimant's impairments," *Chrupcala,* 829 F.2d at 1276, as well as our statement in *Burns* that "great specificity" is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical. *Burns,* 312 F.3d at 122. Indeed, the SSA's own ruling requires a "more detailed assessment" of the claimant's mental limitations at step five of the disability analysis. *See* SSR 96–8p (July 2, 1996).

Of course, there may be a valid explanation for this omission from the ALJ's hypothetical. For example, the ALJ may have concluded that the deficiency in pace was so minimal or negligible that, even though Ramirez "often" suffered from this deficiency, it would not limit her ability to perform simple tasks under a production quota. The record, however, would seem to suggest otherwise. At the second hearing, Dr. Rudnick—upon whose testimony the ALJ relied—was asked the following question: "What happens to [Ramirez's] ability to handle pace, for example, in a work situation, where there's a certain amount of work that has to be done in an eight hours or two hours or whatever segment?" (A.R. at 451.) Although the ALJ briefly interceded before Dr. Rudnick could answer, Dr. Rudick eventually replied that Ramirez's ability to maintain a full-time job depended primarily on "the proximity to where her children would be" because Ramirez's anxiety-disorder is in large part attributable to her "need to feel that she has to be reasonably protective of her children." While this might lead a neutral observer to conclude that Ramirez's deficiencies in pace could be overcome by finding a job close to her children, the ALJ did not include this limitation in her hypothetical. Instead, the ALJ provided only for a reasonable number of personal phone calls. If this accommodation would not remedy Ramirez's deficiency in concentration and pace, the vocational expert might have given a different answer to the hypothetical.

Relying on Social Security Ruling 96–8p, which we reproduced in part earlier in this opinion, the Commissioner contends that the "PRTF does not document specific functional limitations for RFC purposes, bur rather assesses functional loss from a claimant's mental impairments only with respect to broad areas of functioning." In other words, the Commissioner argues that the PRTF findings are relevant only in steps two and three of the sequential evaluation process, before any assessment of a claimant's residual functional capacity is made.

We cannot concur in the Commissioner's evaluation of the PRTF findings. While SSR 96–8p does state that the PRTF findings are "not an RFC assessment" and that step four requires a "more detailed assessment," it does not follow that the findings on the PRTF play no role in steps four and five, and SSR 96–8p contains no such prohibition.

<u>Ramirez v. Barnhart</u>, 372 F.3d 546, 554-55 (3d Cir. 2004).

Defendant correctly notes that, unlike <u>Ramirez</u>, the ALJ here made a specific finding as to the impact of concentration on Plaintiff's ability to work, and found that a limitation to unskilled work was sufficient. Thus, in some ways, this is not a true <u>Ramirez</u> challenge, but rather a challenge to the ALJ's finding that her concentration required only a limitation to unskilled work. However, Plaintiff did not only have problems with concentration. She also had problems with persistence and pace. The ALJ specifically found that she had difficulty finishing tasks. Dr. Fischetto, whose opinion was improperly discounted by the ALJ, opined that she was "slow" in many aspects. However, the ALJ limited his finding regarding unskilled work only to Plaintiff's "concentration difficulty." (Tr. 18). Consequently, with regard to persistence and pace, this is a true <u>Ramirez</u> challenge, because the ALJ found (and the record supports) specific problems with persistence and pace, but no limitations regarding persistence and pace were included. <u>Harris v. Astrue</u>, 4:11-CV-00556, 2012 WL 1902596 at * 10 (M.D. Pa. May 25, 2012) (moderate limitation in concentration, persistence, and pace is not adequately accounted for by a limitation to unskilled work because "[t]here are clearly many unskilled jobs that require an employee to maintain pace."); <u>Foley v. Barnhart</u>, 432 F. Supp. 2d 465, 482 (M.D. Pa. 2005) ("Because pace and concentration are different characteristics which could have distinctly different impacts on performance, the ALJ's hypothetical was not broad enough to include the limitations she recognized in her decision.").

Moreover, the ALJ's conclusion that a limitation to unskilled work sufficiently accommodates Plaintiff's concentration difficulties lacks substantial evidence. The only justification the ALJ gave was that Plaintiff was noted to have an "intact immediate memory, intact remote memory, intact recent memory, and intact concentration on another occasion" with intact cognition, no thought disorder, and good abstract thinking. (Tr. 18) (citing Tr. 365-71,

391-405). It is unclear what records the ALJ was citing. The Court notes that, on July 23, 2008, Dr. Surya noted that Plaintiff had no current thought disorder, and her cognition was "grossly intact." (Tr. 369). However, Dr. Surya also noted that Plaintiff had racing thoughts, trouble concentrating, low energy, and lack of motivation, among other symptoms. (Tr. 369). Dr. Surya also assessed a GAF of 50, which indicates severe impairments. (Tr. 370). Moreover, this treatment record was prior to Plaintiff's alleged onset date. Similarly, the only time intact immediate memory, remote memory, and recent memory are noted is in a treatment note from March 10, 2008, which is also before the alleged onset date. (Tr. 393). It does not appear that the ALJ cited to *any* evidence during the relevant period that Plaintiff's concentration, persistence, and pace would not affect her ability to engage in unskilled work.

Even if the notations from March and July of 2008 had been during the relevant period, they would not have constituted substantial evidence to conclude that Plaintiff's concentration, persistence and pace did not limit her ability to engage in unskilled work. Overall, both state agency consultants who completed a PRTF (Dr. Garvito and Dr. Banks) opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 505, 615). The ALJ concurred at step three. (Tr. 15). The PRTF and RFC assessments are not coextensive. However, the ALJ did not limit his step three analysis to the four broad Paragraph B categories. Instead, the ALJ also made specific findings as to difficulty handling stress and changes in her routine, finishing tasks, and following spoken and written instructions. (Tr. 15). Moreover, as the Court in <u>Ramirez</u> noted, "[w]hile SSR 96–8p does state that the PRTF findings are "not an RFC assessment" and that step four requires a "more detailed assessment," it does not follow that the findings on the PRTF play no role in steps four and five, and SSR 96–8p contains no such prohibition." <u>Id</u>. at 554-55 (3d Cir. 2004).

Additionally, the ALJ cited to these opinions in the RFC assessment, along with the opinion of the examining consultant, Dr. Fischetto. Dr. Garito and Dr. Fischetto both specifically opined that Plaintiff had moderate limitations with detailed instructions. (Tr. 492, 600). Dr. Garito and Dr. Banks both opined that Plaintiff needed to be limited to simple, routine work. (Tr. 541, 604). Dr. Garito and Dr. Fischetto both specifically opined that Plaintiff had moderate limitations with responding appropriately to changes in the work setting. (Tr. 492, 600). Dr. Fischetto opined also opined that Plaintiff had moderate limitations in her ability to respond appropriately to work pressures in a usual work setting. (Tr. 600). Dr. Banks also opined that Plaintiff had moderate limitations in her ability to work in coordination with or proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychologically based symptoms, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 602-03).

Dr. Garito and Dr. Banks both opined that Plaintiff had moderate limitations in her ability to maintain attention and concentration for extended periods of time. (Tr. 492, 602). The form completed by Dr. Fischetto did not specifically ask him to rate her ability to maintain attention and concentration for extended periods of time, but he did spontaneously opine that her concentration, persistence and pace were "poor" because she "has trouble focusing, paying attention, she gets side-tracked. She appears to have a limited attention span today during the evaluation." (Tr. 599). This opinion was based on his objective findings that Plaintiff had slow psychomotor activity, slow and low-volume speech, flat affect, slow productivity of thought, was slow naming the name of the United States' president, and slow information and intelligence for the general fund of knowledge. (Tr. 597). He also found that her concentration was "poor for serial sevens" and that her memory was "slow for remote memory, recent past memory, and

recent memory. Immediate retention and recall was slow for Digit Span. She had difficulty spelling 'world' backwards." (Tr. 598). In sum, none of the medical opinions indicated less than moderate problems with maintaining attention and concentration for extended periods of time.

The ALJ gave "significant weight" to the majority of the opinions of Dr. Banks and Dr. Garito, including significant weight specifically to Dr. Garito's opinions "as to sustaining concentration and persistence…as those opinions are consistent with the evidence of record." (Tr. 18). However, Dr. Garito's limitations regarding concentration and persistence were not included in the RFC assessment. The ALJ gave limited weight to Dr. Banks opinions regarding concentration and persistence because of Plaintiff's "self-employment business and activities of daily living," but this was improper. Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) ("sporadic or transitory activity does not disprove disability").  The ALJ gave limited weight to the opinion of Dr. Fischetto for only one reason: because he had only examined Plaintiff once. (Tr. 19). This plainly constitutes rejecting an opinion for "no reason or for the wrong reason," Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993), considering she gave significant weight to the opinions of physicians who had never examined Plaintiff. Consequently, no reasonable mind could accept the relevant evidence as adequate to justify the ALJ's exclusion of the limitations identified by these medical experts.

The non-opinion record evidence similarly contradicts the ALJ's RFC assessment. Although Plaintiff was noted to have normal memory, thinking and concentration on March 10, 2008, her treating physicians opined that she had impaired memory, thinking, and concentration on April 23, 2008, May 8, 2008, June 5, 2008, June 17, 2008, and July 17, 2008. (Tr. 395-399). She was observed to have impaired energy and motivation on February 21, 2008, March 19,

2008, April 23, 2008, May 8, 2008, June 17, 2008, July 17, 2008, May 28, 2009, throughout her

incarceration, and on September 13, 2010. (Tr. 395-96, 398-400, 420, 438, 560-78, 588).

Defendant cites to Douglas v. Astrue, CIV.A. 09-1535, 2011 WL 482501 (E.D. Pa. Feb.

4, 2011) for the proposition that limiting a claimant to unskilled work adequately accommodates

moderate limitations in concentration, persistence, and pace. However, Douglas relies on a

distinction between "often" and "moderate" to conclude that Ramirez does not apply. The Court

does not find this reasoning to be persuasive. Instead, the Court notes that:

> At the time *Ramirez* was issued, the regulations rated the relevant limitations on a
> frequency continuum: "never," "seldom," "often," "frequent," and "constant." Revised in
> 2000, the present system rates mental impairments in terms of severity: "none," "mild,"
> "moderate," "marked," and "severe ." *See Colon v. Barnhart,* 424 F.Supp.2d 805, 811
> (E.D.Pa.2006) (explaining the revisions). Various district courts have concluded that a
> rating of "often" under the former system is equivalent to "moderate" under the present
> system, as both designations fall at the same point on the five-point scales. *See, e.g., Id.;*
> *Dynko v. Barnhart,* No. 03–cv–3222, 2004 WL 2612260, at *5 n. 34 (E.D.Pa. Nov.16,
> 2004).

Keefer v. Astrue, 3:12-CV-1665, 2014 WL 1095726 n. 10 (M.D. Pa. Mar. 19, 2014). Other

courts have relied on nonprecedential opinions, McDonald v. Astrue, 293 Fed. Appx. 941, 946 &

n. 10 (3d Cir.2008) and Menkes v. Astrue, 262 F. App'x 410, 412 (3d Cir. 2008), to conclude

that Ramirez does not apply to cases after 2000 that use the severity scale instead of the

frequency scale. However, Menkes did not even mention Ramirez, even though it was directly

on point. Another District Court has explained why McDonald is not persuasive:

> The Commissioner does not dispute that the ALJ did not include in his hypothetical
> question any explicit limitation in line with his finding that Plaintiff had "moderate
> difficulties" with concentration, persistence, or pace. Rather, the Commissioner first
> argues that *Ramirez* 's holding has been narrowed by the subsequent decision of
> *McDonald v. Astrue,* 293 F. App'x 941, 946–47 (3d Cir.2008). I need not address this
> argument in much detail because regardless of *McDonald'* s holding, that decision is not
> precedential. *See* Third Circuit Internal Operating Procedure 5.7 (indicating that non-
> precedential "opinions are not regarded as precedents that bind the court because they do
> not circulate to the full court before filing"); *In re: Grand Jury Investigation,* 445 F.3d
> 266, 276 (3d Cir.2006) (explaining that because the Third Circuit's Internal Operating

Procedures do not regard non-precedential opinions as precedent binding upon itself, these non-precedential opinions "are not precedents for the district courts of this circuit"). Thus, *Ramirez* remains the controlling law of this circuit, binding on this Court.

Boyle v. Colvin, 12-4724 FLW, 2014 WL 3556507 at *11 (D.N.J. July 18, 2014). The Court also

finds the following rationale persuasive:

> Citing *McDonald v. Astrue,* 293 Fed. Appx. 941, 946 & n. 10 (3d Cir.2008) (*non precedential),* the Commissioner argues that the difference in nomenclature between "moderate" and "often" means that *Ramirez* is inapposite. Def.'s Br. at 14–15. However, *Strouse* and *Weinsteiger* provide convincing explanations for why *McDonald* does not undermine the *Ramirez* rule as it is applied in this district. *See Strouse,* 2010 WL 1047726, at *6 (explaining that *McDonald* failed to address the change in regulatory terminology and the nomenclature change was not dispositive, because there was a lack of record support for McDonald's asserted functional limitations); *Weinsteiger,* 2010 WL 331903, at *10 & n. 3 (noting that *McDonald* is not precedential and, as explained in *Bunch v. Astrue,* 2008 WL 5055741, *5 & n. 4 (E.D.Pa. Nov.26, 2008), the change in regulatory terminology does not circumvent *Ramirez's* requirement that hypothetical questions accurately convey the limitations the ALJ has found).

Plank v. Colvin, CIV. 12-4144, 2013 WL 6388486 (E.D. Pa. Dec. 6, 2013). Moreover, unlike

Ramirez, there is no indication that the ALJ in Douglas also found a specific limitation in pace.

Here, the ALJ specifically held that Plaintiff had difficulty finishing tasks.

Defendant's only other argument is that Ramirez is distinguishable here because the ALJ

"found that the only vocationally relevant limitations were the need to avoid" social interactions.

(Def. Brief at 26). Defendant's assertion is circular logic: because the ALJ found that difficulty

concentrating and finishing tasks do not cause vocationally relevant limitations, the failure to

include concentration, persistence and pace limitations was proper. Moreover, this is exactly

what happened in Ramirez. In Ramirez, the claimant had multiple medical source opinions that

she "often" had problems in concentration, persistence, and pace, and "often" was the middle

category on the PRTF. Here, Plaintiff had multiple medical source opinions that she had

"moderate" limitations in concentration, persistence, and pace, and "moderate" was the middle

category on the revised PRTF. In Ramirez, the consultative psychiatrist opined that the claimant

could not perform complex or complicated work. Here, the ALJ specifically found that Plaintiff had difficulty finishing tasks and difficulty concentrating and multiple doctors opined she could not perform complex or complicated work. Thus, <u>Ramirez</u> governs this case.

<u>Ramirez</u> and <u>Burns</u> do not require the ALJ to include a limitation in concentration, persistence, and pace if the record otherwise supports a finding that no such limitation is necessary. However, here, the ALJ selectively cited to two treatment records before the alleged onset date to conclude that Plaintiff's concentration, persistence, and pace difficulties would not limit her ability to perform unskilled work.  This is insufficient for the Court to conclude that the record otherwise suggests that no additional limitations were necessary. As another Court in this District has explained:

> In light of *Ramirez,* which Plaintiff invokes in her brief, we find that the ALJ's hypothetical failed to sufficiently convey Plaintiff's impairments. We deem it significant that the ALJ's own factual finding reflected that Plaintiff experienced "moderate" deficiencies in concentration, persistence, or pace at step three (Tr. 20), but that later, without expressing a rationale, the ALJ not only failed to mention such deficiency but affirmatively stated that production or pace work would be acceptable. (Tr. 61). <u>It is plausible that, as suggested in *Ramirez,* the ALJ determined Plaintiff's limitations in concentration, persistence, or pace to be adequately moderated by means of other accommodation. However, the ALJ did not offer a rationale which would harmonize the two apparently dissonant statements.</u> We are further compelled by the rulings of other district courts within our Circuit, which have similarly refused to uphold an ALJ's decision where the claimant had "moderate" deficiencies in concentration, persistence, or pace (or "often" experienced such deficiencies), and the ALJ limited the claimant to only simple and routine and/or low-stress work. *See, e.g., Kaumans v. Astrue,* No. 11–cv–01404, 2012 WL 5864436, at *10 (M.D.Pa. Nov.19, 2012).*Keiderling v. Astrue,* No. 07–2237, 2008 WL 2120154, at *6–7 (E.D.Pa. May 20, 2008); *Barry v. Astrue,* No. 05–1825, 2007 WL 2022085, at *4 (E.D.Pa. July 9, 2007); *Foley v. Barnhart,* 432 F.Supp.2d 465, 481–82 (M.D.Pa.2005). In addition, as observed by *Ramirez,* we cannot discount that it is Defendant's burden to demonstrate Plaintiff's capacity to undertake alternative employment in the national economy. *See Ramirez,* 372 F.3d at 555 (citing *Burns,* 312 F.3d at 119).

<u>Keefer v. Astrue</u>, 3:12-CV-1665, 2014 WL 1095726 at *5-6 (M.D. Pa. Mar. 19, 2014) (emphasis added).  Consequently, the ALJ's decision lacks substantial evidence.

## B.        Remaining allegations of error

Although the ALJ, in his discretion, may revisit these issues, the Court finds no merit to Plaintiff's remaining allegations of error. First, Plaintiff writes that the ALJ improperly evaluated the subjective symptoms arising from her physical impairments because "the ALJ only cites to Grays' period as a house cleaner to support the assertion that she is not disabled." (Pl. Brief at 18). Plaintiff proceeds to challenge the ALJ's reliance on Plaintiff's ability to work as a housekeeper and go grocery shopping. (Pl. Brief at 18-19).

However, the ALJ did not "only" cite to Plaintiff's daily activities. The ALJ relied on two additional, separate factors to discount Plaintiff's credibility. First, the ALJ asserted that medical evidence in the record contradicted her claims. (Tr. 17-18). The ALJ noted that she generally had a good gait and upright stance, she denied musculoskeletal problems and had no leg weakness, she generally had normal strength, balance, and coordination, negative straight leg raise except for one occasions, could heel and toe walk and had no atrophy in her lower extremities. (Id.). Second, the ALJ rejected Plaintiff's credibility because of her limited, conservative treatment. (Tr. 17-18).  Plaintiff has not challenged any of these findings, and they are proper bases for rejecting credibility. SSR 96-7p. Thus, even assuming the ALJ erred in relying on Plaintiff's activities, substantial evidence would still support the credibility finding.

Additionally, Plaintiff's argument that the ALJ erred in failing to find that her back impairment meets or equals Listing 1.04A fails. Listing 1.04A requires sensory or reflex loss. Plaintiff does not identify any objective medical evidence to support a claim that she experiences sensory or reflex loss and Plaintiff's credibility regarding her subjective statements was properly discounted. Instead, the examinations revealed that her reflexes were normal and symmetric. (Tr. 374, 410, 525, 548). Thus, there is no merit to this allegation of error.

Third, Plaintiff's argument that the ALJ erred in assessing her to have only moderate difficulties in social functioning or concentration, persistence, and pace fails. No physician opined that Plaintiff had greater than moderate limitations in these areas. With regard to social functioning, Plaintiff cites to Dr. Fischetto's consultative opinion and the ALJ's limitations regarding social interaction in the RFC assessment. However, Dr. Fischetto opined that, for the purposes of the Paragraph B criteria, Plaintiff had only moderate limitations. Plaintiff has cited no authority for the proposition that an ALJ must find a marked limitation in social functioning at step three if the ALJ subsequently limits a claimant's social interactions in the RFC assessment. The RFC assessment is a more detailed evaluation of specific functioning than the step three assessment.  Moreover, Plaintiff does not challenge the ALJ's justification for finding that her impairment is no more than moderate. The ALJ wrote that Plaintiff "spends time with others…does not need to be reminded to go places…does not need to be accompanied when she goes out…has several friends…[and] was noted to be cooperative during a consultative examination." (Tr. 15). A reasonable mind would accept these factors as adequate.

With regard to concentration, persistence, and pace, Plaintiff asserts that it was improper for the ALJ to rely on Plaintiff's memory to find that her impairment in concentration, persistence, and pace were only moderate. (Pl. Brief at 13). Plaintiff selectively cited from portions of Listing 12.00(C)(3), noting that:

> Under 20 C.F.R. Subprt. P. App. 1 12.00(C)(3) concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit timely and appropriate completion of tasks commonly found in the work setting. Additionally, on mental status examinations, concentration is assessed through tasks such as serial sevens or serial threes.

(Pl. Brief at 13-14). However, Plaintiff fails to note that next sentence states "[i]n psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term

memory or through tasks that must be completed within established time limits." <u>Id.</u> Thus, the Listing explicitly allows for memory to be used as a consideration in evaluating concentration, persistence, and pace. The Court concludes that a reasonable mind would accept this evidence as adequate. Consequently, substantial evidence supports the ALJ's step three determination.

## VII.     Conclusion

The Court finds that the ALJ's decision lacks substantial evidence because she failed to include all of Plaintiff's nonexertional limitations in her RFC assessment or provide adequate explanation for their omission. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 11, 2014                           _____s/Gerald B. Cohn_____
                                                                              GERALD B. COHN
                                                                              UNITED STATES MAGISTRATE JUDGE